The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Our third case today is Eddie Stewart versus the GES Recycling, South Carolina. Ms. Sumter, good to have you with us, Ms. Sumter. Nice to see you. Good to be here. Good morning. May it please the court. I'm Geraldine Sumter and I represent Eddie Stewart in connection with this matter. First, I want to make clear that the only issue before the court today in this case is whether the district court improperly granted summary judgment on the retaliation issue. The hostile work environment and race discrimination issues are not before the court. Now, the strongest claim would have been the hostile work environment, wouldn't it have been? Maybe. Maybe. It's time barred. It was ruled to be time barred and it was not appealed. That's correct. Now, in this matter, what we have is an employee who on June 13, 2017, was met by a manager who engaged in some offensive, ridiculing, racially offensive behavior. That incident occurred outside on a dock. Later, there was a conversation between the two of them in a break room in the presence of other employees. And as is required, we must take the language and the behavior in the total context of the employment context. We are not talking about an office complex, a school, a university. We're talking about a crude work environment and a recycling plant. Where the plaintiff's evidence shows that that kind of language profanity is often used. Now, after the discussion in the break room, plaintiff gets a call on his cell phone after the supervisor, Adam Gordon, leaves to direct him to come to his office. At which point he starts, he tells my client to sit down. Client says, I don't feel like sitting down. And he uses profanity. I'm not trying to minimize that. That's a fact. In the record, my client, in every statement, in his deposition, in his charge to the EEOC, related that he used that profanity. It wasn't just light-weighted. I'm sorry? It wasn't just light-weighted profanity. He lit into them real good, didn't he? Your Honor, this is the kind of profanity that for someone of the age group of most people in here would say was just abhorrent. But in today's context, that MF word is used so regularly, even by younger people, in social media, on television, everywhere. Whether that behavior is as severe as it is represented is a question of fact. It means when you're speaking to someone who's your supervisor, your boss, or your employer? No, Your Honor, I personally would not accept that, but I work in a law office. I'm not out in a construction site or in a recycling plant. Recycling plant, pretty rough place to work. Of course, Your Honor. Hard work. I would suspect so. I have not done it, but everything that I've done. I haven't done it either. I know it's got to be hard work. Yes. So, counsel, can I ask a question? I may be jumping ahead a tad, so I'm sorry if I'm getting out of the order that you were going to present it. But, yeah, I've reviewed this a lot and it would be one thing if Mr. Gordon terminated your client. But he wasn't the one that took or carried out the adverse employment action. So, I guess what I'm trying to understand, it sounds like in your pretext argument and in your direct evidence argument, you have some statements that Mr. Gordon made that are abhorrent. And I don't question them or that they show animus. But does it matter that the individuals who terminated your client were different individuals in terms of the legal issues? No. Why is that? And it doesn't because that animus is imputed to the defendant. Go ahead, ma'am.  Isn't there requirements for that? Doesn't there have to be evidence that the speaker, the speech that is imputed or the comments that are imputed need to have been made by someone who intended for those to be acted on? Or am I wrong? No, that's actually the standard. What's the evidence that Mr. Gordon intended for there to be some sort of adverse employment action? The evidence is that before even Mr. Stewart was employed, he had made comments to other employees. You have it in the statement of Patrick Denny. Right. And you have Mr. Stewart's testimony in his charge to the EEOC and in his deposition that Gordon said to him, you should stay away from these two because they're talking about discrimination. Right. He said that they've been trying to fire those two because of discrimination. One of them was fired. And on June 13, 2017, Eddie Stewart reminded him that he had told him about those comments and how he did not appreciate people making claims about race discrimination. And Eddie Stewart said to him, and that's why you fired Jermaine Phillips. And taking the evidence in the light most favorable to my client, which you must do at this point, Mr. Gordon did not deny that he had said that he would fire somebody who had made complaints of discrimination. What he said was that wasn't the only reason that he was fired. There were other things as well. And Patrick Denny says that when he complained about inappropriate race remarks and behavior in the workplace, Adam Gordon specifically said to him that if he didn't stop talking about that, raising those claims of race discrimination, he would be fired. So taking Mr. Stewart's complaint and his raising concerns about discrimination that he did in that meeting, that office on June 13, when he raised those complaints, we are entitled to have those prior comments and the comments that he made directly to my client when he was hired or soon after he was hired used as evidence of his intent to fire people who complained about discrimination. That, I think, is sufficient to bind the company. In this most recent case in this circuit, I'm going to get the name wrong, Wanamaker Amos versus Purinobi, there was a supervisor manager who years earlier had made some disparaging remark about black people and said, you know those black people. Not close in time to the time that he was recommending that this woman get fired, but the court there said that that past evidence of his animus could be used to show pretext. Yeah, but I think if I remember that case, you sound like you read it more closely, so please correct me if I'm wrong there. My memory of that case was that the person who made that comment was the person who terminated that employee. Was the person who recommended the termination. Recommended. Yes. And here, as I understand the record, and correct me if I'm wrong, there's not any evidence that Mr. Gordon yet recommended or was a part of the decision to terminate your client. Am I correct about that? There is no evidence in the record that Adam Gordon was a decision maker, but the evidence in the record is that Adam Gordon gave evidence about what happened on that day. And so the question is, you know, in a discrimination case, you can prove pretext by showing falsity, or by direct evidence, circumstantial evidence of falsity. And so the question is, did Mr. Stewart actually threaten Adam Gordon? If you believe what the defense is saying is that he not only used a bad language, but he was threatening and using it, and he had Gordon pinned up against the wall. And that he had used the word, the B word, directed at a female employee. He does not, he denies that. And so given this history on Adam Gordon's part, and given the fact that in his conversations with Mr. Stewart, Gordon acknowledged and even told him, on more than one occasion, that he was not in favor of people raising complaints of discrimination, that that is enough to give a jury a question in their minds on whether, whether when Adam Gordon is reporting incidents, that incident on June 17th, whether he in fact was telling the truth about being threatened. So your argument is, he said before, I don't like, you know, complaints about discrimination. There's witnesses who have said that had a role in other terminations. On the day that we're focused on here, he reported what happened in terms of being interviewed. And that, you know, that we should infer from all that, that he reported in a way that was intended to be getting fired? Yes. Okay, I understand your argument. All right. Thank you. Certainly. Now, in addition to… Let me be clear on, make sure I understand that. It sounds like he just went and reported on his own. I thought this conversation was something that was being overheard by a supervisor, who then caused it to be further looked into. That's when it came up. But Mr. Gordon didn't, on his own, just go up and make the report. I'm not saying that Gordon went to somebody and said, fired Eddie Stewart. No, that's not what I'm saying. I'm sorry, my name escapes me. But another person… He waited, and it was when the supervisor, who I guess oversaw this commotion, wanted to know what it was all about. Is that not the way it happened? What happened is there was a gentleman in an office who testified that he did not see the incident, but he heard some commotion, and when he came out, he then talked to Eddie Stewart and essentially said… The gentleman in the office, was that a superior to Gordon? I think so. That's the point. That goes back to where we're going here. That's the person who then took action, and if he went and asked what happened, I don't know if that's a report or he just asked him what happened and made the decision to then terminate the client. They claimed that there was an investigation, and they questioned people. They asked… Now, for somebody who was supposed to be so threatening that it justifies a termination, understand that on that day, that individual… And I'm sorry, name escaped me. That individual told Mr. Stewart to go home for the rest of the day. He didn't call the cops. He didn't do anything like that. And then the next day, they called this man who was supposed to be so threatening to come back to their premises and give them a statement. And he did. And so the question… We started out asking about this language thing. You did a beautiful job of, I guess, comparing how things are now and how they used to be back in so-called out world. I got that. Or how we would do things. But even with what he did and just the whole record deal, you cannot divorce a feeling this is not a regular guy with what he's saying and how much he says it. And I don't want to repeat those words in here. Those words themselves are caustic. But you got to believe he didn't just stand in a corner and gently say them. I mean, it's like he was really an aggressive guy. And he used some really, really hard language, even by today's standards. I'm not sure there are many individuals that even take that today about what he did. Well, Your Honor, if you and I are going to have to decide whether that was threatening or not, that's a question for a jury, not for a judge. But what is hostile and insubordinate as the reason for doing it, and this supervisor saw them in this and made a decision, who may have a different level of sensitivity, but say, no, we're not going to have that here. You've got to go. So let me be clear. The supervisor who came out put an affidavit in. And he said that he did not see what happened. He only heard some commotion. So this notion that Adam Gordon was pressed up against the wall and threatened by my client only comes from Gordon and is not my client. That, I say, is a genuine issue of material fact, coupled with all of the other evidence that should take this issue to a jury and not be decided on summary judgment. And my red light is on. Thank you. Thank you, Ms. Sumter. And you say it's time for rebuttal. Mr. Fryer? Yes, Your Honor. May it please the Court, my name is Ben Fryer, and I'm here on behalf of GetHellyGES Recycling in South Carolina. When I was going to law school down the road in Charlottesville, and I imagine you've seen an argument like this today, I was not anticipating riddling the record with coarse language and some things that my mother would be embarrassed to hear me say, and I'm glad I probably won't have to do that today. But I think there are a couple of things. This is language that no one will use in the courtroom. I don't know why. That's right, Your Honor. It might be more effective if we did. It's okay to say what's in the record. It's in the record. It's not you saying it. I don't say the language. That's exactly it, and you're quoting. You're not saying it yourself. And I think that what you just said were quoting. And who are we quoting from? We're quoting from Mr. Stewart. Mr. Stewart, the language was going both ways. That's not true, Your Honor. You don't think? No, it's not true, Your Honor, and I think it's important to look at the record because, Mr. Stewart, there are three statements from Mr. Stewart in the record. One is the written statement that he gave GES as part of this investigation, and he admits to calling his supervisor a number of terrible names. And which supervisor? That would be Mr. Gordon. Gordon. Gordon was direct supervisor. That's his direct supervisor. And in Mr. Stewart's. And he used the MF word. MF word, the fat MF word. This is a number of things. What he does not say in that statement anywhere is that Mr. Gordon used any language similar to that whatsoever. Well, maybe he didn't, but he used, I mean, he may not have been using the same profanity. At least the record may not indicate he was. I think there's some record that it was mutual, but maybe not specific here. So grant you that, but can you push someone with racial comments that are indefensible to the point that if they, for lack of a better word, snap and let loose with some expletives that you then say, well, yeah, you're insubordinate. Well, I think there's a couple pieces to that, Your Honor. I think one is about the claim we're here on. If Mr. Stewart's coworkers, as he has alleged, engaged in vile, racist comments, I can imagine the person being quite disturbed and touched by that. Those claims are not here today. The only claim here today, no, I'm sorry, Your Honor. The only claim here today is about this incident on which Mr. Stewart complained to Mr. Gordon. Mr. Stewart admittedly was profaned at the least, admittedly caused a disturbance because he says two different employees came down. One told him to calm down, to be quiet. Another, the CFO, came down, locked him out. What he doesn't say . . . It sounds like your answer, and I'm sorry to cut you off, I just don't want to take all my colleagues' time with this, is that the question I asked may be more relevant to, as Judge King kind of, I think, alluded to earlier, maybe a hostile work environment claim or something else, but we're, for whatever the reason is, we're here on something specific and, you know, that's what you're focused on. It is, Your Honor. You're limited to the retaliation claim. That's the claim that's on appeal. That's the only claim, Your Honor. That's the only claim. But the other evidence that's in the record, to the extent it's relevant background for what you want to get to can be considered. It's the context. Sure, but the context . . . We can look at the context. Sure. We don't have to isolate it to that one incident. And that's fine, Your Honor, but I think that's fine here because the context is Mr. Stewart is actually making the complaint to Mr. Gordon about racial discrimination. He has every right to do that. He has absolutely no right to behave himself in the way he did that day. You can make a complaint that is a protected activity under Section 1981, which is the statute of limitations here. You can make that complaint and it can be in good faith and meritorious. But if you do it while you're kicking the HR department's door down and wielding a knife or something like that, your conduct is not protected. What we have here is . . . What if, though, does it matter if the course of conduct . . . And I know you're saying that Mr. Gordon didn't . . . The record doesn't show his profanity, but hypothetically, if we do have an environment where Mr. Gordon at his level and Mr. Stewart at his level, they're cussing like sailors all day long back and forth, does that matter? I mean, you know, you then . . . No one's fired him for cussing for the whole time he's been there. And then he, you know, gets fired for insubordination based on, you know, no question about it, a language that is probably not spoken with the greatest degree of care. But does the environment not matter at all? No, it certainly matters. And I think it's just what Judge King says. Context matters, right? If you are out on the production floor and it is commonplace to curse . . . If you're cursing about a bad call in a football game and that's allowed, then that's allowed and that context matters. But this context, what we do not have, there is no evidence that any employees ever, ever subjected their boss to this kind of language. There's no profane name-calling. There's no example of anyone else ever engaging in anything like this. And that is different. He wasn't a big boss, though. He was an intermediate boss. He was the supervisor, but he wasn't enough of a boss to be the decision-maker. That's right, and that's a very good point. He's like the foreman or something like that? He's more than that. In the Army, maybe the squad leader? I would say more like a junior officer, perhaps, than that. But you're right. He wasn't the decision-maker because what happened here was because of the disturbance, the CFO came down and asked Mr. Stewart to leave, come back tomorrow, wrote the written statement. He came in. He gave that written statement. It's in the record. Mr. Stewart, to his credit, pulled no punches. He admitted to what he said, and this was an investigation. But what he said sounds like it was all common language around there all the time for years before that. Well, Your Honor, Mr. Stewart does not say that it's common language. Oh, he doesn't say that, but... He does not say that that is common language. There was a former employee that gave a affidavit that said it was common. And that never says it's appropriate to talk to a supervisor like that or that it had never happened before. But it seems like he did it all the time. It wasn't like he did it one time, and when he did it, it didn't seem to make a big difference. I mean, he did it one time, and, you know, hey, that's kind of the way it is. You know, the difficulty of this case is, as something pointed out, he works in a law office. We work in different environments. Even one of these statements would have been enough. It would just not happen. But we all know, and we live in a world where we know the environments in which that kind of language is said as a matter of course. It's just the way you talk. And so getting back to Judge Qualibon's point is, and maybe the record needs to be developed for that, or maybe we are just not there if we get into the question of, is this a jury question? In other words, do you allow the record to be developed to say, well, this is an environment that gets close to saying it's a hostile environment? Well, maybe not under their standards, but under objective standards, it certainly looked like one to me. But, you know, the point being is, when we look at the cold record at that language, oh, you can decide this case right away. That looks there, but you know that's not just what is there. There's something here, and that's the nagging part of this case. You know there is something else going on here beyond him using that language. And, you know, an individual who would use that language, mostly you would know, if you ever call your boss that, most people would expect, I'm not gonna be here tomorrow. You wouldn't even show up the next day. You know that's not gonna happen. But there's no belief that that's enough to get rid of me in this instance by this individual. It's like, and it sort of points to, this is the culture in which you work. It may not have been the culture of the supervisor, and that's the problem. If you have the culture being of the workers, but then the supervisor may have a different take on it, and he may, I don't know, he wasn't hurt or whatever, but he lives there, and sometimes people turn a blind eye like they don't hear it. But the supervisor, those are who matter, right? It's the decision makers who matter. I'm talking about the supervisor of Gordon. I'm not talking about Gordon. And I am too, Your Honor. That's your, your point I think would be the issue I've kind of pushed and Judge Wins pushed is maybe they're in the light most favorable to Mr. Stewart. There's a, you know, environment where he thought he could talk that way. I know you're not agreeing with that, but hypothetically, if that's true, isn't, given the fact that he wasn't the decision maker on the adverse employment situation, there has to be evidence that he did something with the intent of affecting termination? Yeah, that's exactly right, Your Honor. The investigation was done by two senior leaders at GDS, one an HR representative, one an operations team, so they got these statements, and they told Mr. Stewart why he was terminated. And these are, this is Mr. Stewart's words. Mr. Stewart said he was told he was terminated because we understand you have some concerns, but we cannot allow you to talk to your supervisor that way. Full stop. Not that you threatened him, not that you backed him into a corner, not that we credited one story versus yours. Your story that you tell us is that this is how you spoke to your supervisor. And maybe there were some issues, and by the way, the record shows that they were investigated that way. Maybe there were some issues, but you cannot talk to your supervisor this way. We cannot run a company this way. And so this notion of whether a scrap metal... Look how the business really was this. It was called recycling. It is just that, Your Honor. It's scrap metal. Up in West Virginia, we used to call them junkyard. That's something different. Not completely. It's scrap metal. It's bringing these things in from different places. It's twice around, I expect, to work. But I would submit to you, Your Honor, that if we go to those environments... The big fight, one of the big arguments they had back and forth, who's gonna run the crane? And whether this Gordon was permitting the plaintiff to be trained to run the crane. That was some prestigious part of the job, I think. But he didn't get trained. But the record is clear on that as well. There were two other African Americans that were trained on the crane and operated it regularly. There was a third that was sent for training and operated it regularly. There was two others that chose not to be trained. And Mr. Gordon told Mr. Stewart, if you want to be trained on the crane... No, it's just a rough place to work. And bad language was common. But that... And talking to each other in bad language was common. That's just the way they operated. But there's no evidence that anyone spoke to their supervisors in this manner. And I would submit to you that even if these individuals were using this bad language, if one of them belligerently calls the other a fat MF-er, there might be a problem there. It might not be suddenly excusable. But there is no evidence that this is cultural or within any range of appropriateness to talk to your supervisor in this manner. And again, it may be perfectly fine for employees out on the production floor moving scrap metal to use profanity. But when they are speaking in this kind of manner, in an insubordinate manner to their supervisors, it's undermining the ability of a company to function and manage its employees. And that's exactly what the decision-makers say here. These decision-makers, they don't say they base something on what Mr. Gordon said. They said, we base this on your statements, Mr. Stewart. And maybe you have issues here, and those were investigated. But you cannot speak to your supervisor in this manner. And that's what happened here. And those two individuals were divorced from whatever was going on with Mr. Stewart, Mr. Gordon. Mr. Gordon, there's no evidence that he provided any recommendation on termination. And point of fact, look at their two statements. Mr. Gordon doesn't even quote a person. Mr. Gordon's statement is actually far tamer than Mr. Stewart's statement. And it contains no indication of what he thinks would happen. And in point of fact, Mr. Gordon didn't have any intention to terminate Mr. Stewart. But when Mr. Stewart said, hey, I'm, he told the co-worker, hey, I'm terminated, Mr. Gordon said, no, you're not. You're suspended for tonight. And that was all he was doing. And he had no role in the termination that proceeded only after an investigation. And our case law shows that that, therefore, cannot be imputed to those decision-makers. And so I think that matters immensely, both for the decision, whether it's direct or circumstantial evidence. But I think it also matters immensely for whether Mr. Stewart can prove pretext, whether he can prove that these decision-makers' real reason for terminating him was because he complained to Mr. Gordon about racial discrimination. There's just no evidence to suggest that that is a false statement. And unlike many cases that we've seen, and certainly that my esteemed counsel has referenced, there are many cases where an employer says something at the date of termination and then tells a court something very, very different 18 months later. There's never been anything like this here. The individuals who informed Mr. Stewart of his termination told him exactly why. It was based on his admitted misconduct in how he spoke to his supervisor. And that's never changed at any time to this day. So there's no question about it. There's an indication here in the record that Mr. Gordon didn't think much of people complaining about discrimination. He told the plaintiff when he started that he should stay away or not hang with two specific African-American drivers because both they complain about discrimination. And he was sensitive to the black workers complaining about discrimination. And if that were true, that he said that, which we can assume for the purposes of the summary judgment process. Don't we have to accept that? That's right. That's true for purposes of our review. Very good point, Your Honor. That's a point. That's a fact for purposes of our review. That's true. So we accept that as true. So you have to get past that. But here's how we do, Your Honor. To convince us that is termination. And the way we get past that is because if Mr. Gordon had been the one who terminated Mr. Stewart, then Mr. Stewart probably would have survived summary judgment at the district court. But Mr. Gordon's not. And there's no evidence of any kind that Mr. Gordon had any role in the termination decision or that he contributed any false information or biased information to the decision. There's no evidence of that whatsoever. And so assuming that what Mr. Gordon said is alleged to have said is completely true, it matters not here because he's not the decision maker and he didn't do anything to contribute to this decision being made. This decision was based on the admitted misconduct by Mr. Stewart that he freely told GDS as part of this investigation and that the decision was made by two individuals with management and HR positions that had nothing to do with Mr. Gordon. And I will just say, Your Honor, there's background here that may have been a cause of action of other types at some point in time. And the lower court found that those were either not sufficient on merits or they were time barred and they haven't been appealed yet. Those were other... That's the reason I made my remark earlier that it was a hostile work environment. There could have been. On this evidence. There could have been. And that may have been an alternative avenue that the law allows for. But this is not a hostile work environment claim. It's a retaliation claim. That's right, Your Honor. And I will seize my minute or so unless there's questions. Thank you very much. Yes. Thank you, Your Honor. Ms. Sumter. In the retaliation case, court has, Supreme Court has told us that the plaintiff's burden is proved that but for the fact that he engaged in protective activity, a decision and adverse action did not have occurred. But for does not mean that that's the only reason. We have seen from the Supreme Court in Judge Gorsuch's opinion in Vostok that but for doesn't mean the only reason. And so in a case where you have a retaliatory animus so clearly stated by a manager who reports to the CFO and others who were making the decision, I think that it is appropriate for you to take into consideration that animus and impute that animus to the other folk who were involved. This court just recently did that in the Wanamaker Amos case. In addition, on a retaliation case where there has been a showing of some animus, it is not necessary for the plaintiff to show comparator evidence. This isn't a straight discrimination case. It's a retaliation case. And the plaintiff doesn't have to go around and show how every other person in the work environment who used this kind of language was treated. But what the plaintiff has shown to you is that while the MF word is a bad word, that there were other equally offensive comments of a racial nature which never resulted in anybody being disciplined lest more terminated form. And so if offensiveness alone is a criteria or a consideration and determination, then we would say, yes, look at that information. Now, this question, and I know it is on your mind, can an employee, can you say to employers that you have to allow an employee to talk to supervisors any kind of way? That is really not what I am suggesting to you. What I am suggesting to you is that where the company says, just because you use this language to your supervisor, we are going to terminate you, becomes a question of fact when there is evidence of retaliatory animus in that process. And for that reason, this case should go to a jury. Thank you. Thank you very much, Ms. Sumter. We are going to adjourn the court for the week. Come down to great counsel and wish everyone the best. This honorable court stands adjourned, sine die, God save the United States and this honorable court.
judges: Robert B. King, James Andrew Wynn, A. Marvin Quattlebaum Jr.